UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ILLINOIS CENTRAL RAILROAD
COMPANY,

         Plaintiff,

         v.

MICHAEL BELCHER,

         Defendant.

CAUSE NO.: 2-22-cv-353-PPS-JPK

OPINION AND ORDER

Plaintiff, Illinois Central Railroad Company ("IC"), filed a motion for contempt sanctions and attorney fees because of Michael Belcher's alleged violation of the Court's October 25, 2022 Temporary Restraining Order and destruction of key evidence. [DE 37.] Because I find Belcher directly violated the parameters of the TRO, the motion for contempt sanctions and attorney fees [DE 37] is GRANTED.

**Background**

Defendant, Michael Belcher, is a former employee of IC. He worked at IC from 2002 until he was fired on October 19, 2022. During his tenure there, Belcher became proficient in programming languages, and he took it upon himself to automate and streamline the company's internal auditing functions. Among other applications, Belcher created the Program Management Application ("PMA") for IC - the thing at the heart of this dispute.

As time went on with the company, Belcher was starting to feel underpaid and

underappreciated by IC. About 400 employees per year used the PMA, and it helped budget owners review and monitor their costs and responsibility, as well as the auditors of costs and financial planners in the company. At the same time Belcher was feeling over worked and disgruntled, IC began investigating some reportedly questionable behavior of his at the office. Following an investigation regarding his relationship with a subordinate, Belcher sent the following e-mail to his manager on October 17, 2022:

> This company has failed to do the right thing by me over and over again, as such I am no longer allowing the use of my intellectual properties with out fair market compensation. I am not relinquishing my position as Financial senior manager and as such it is my duty to inform you that many of our finance systems are no longer functioning. I will be out of the office for the rest of the day but can be reached on my cell phone with a reasonable offer for compensation in this matter. As info the longer this take the higher the price, if I am offered something offensive the higher the price. Hope that you have a great rest of the day.

[DE 58-3 at 5.]

After receiving this e-mail, IC began investigating its systems and confirmed that Belcher had removed source code and files across three systems, disabling the use of the applications he created. *Id.* While Mr. Belcher later testified at the hearing held before me on August 31, 2023, that he was in the process of transferring access to the PMA to another person when he was locked out of the system by IC (and that is why the PMA was not working at the time); nevertheless, from IC's perspective, the system was down. IC sent Belcher an email on October 19, 2022, terminating Belcher's employment and demanding he return the company's property and restore its systems. [*Id.* at 6.]

2

At this point, IC filed suit and sought its first temporary restraining order against Belcher.  This case was originally assigned to my colleague, Judge Damon Leichty, and he held a hearing in this matter on October 25, 2022.  Belcher didn't have time to secure counsel yet, so he represented himself at the TRO hearing.  During that hearing, Belcher repeatedly told the Court that he no longer possessed IC's source code and related materials because he shipped them back to IC on his Company-issued laptop:

> • "I have returned most of CN's property. The only thing left in my possession is a docking station, company cell phone, and some documents." [DE 22-2, TRO Tr., at 30-31.]

> • "I no longer have the source code, Your Honor. It was on CN's PC, which I shipped on October 22nd at 9:30 in the morning" [*Id.* at 32.]

> • "THE COURT: All right. Do you know where CN could look for that source code on that computer? MR. BELCHER: … On that PC, it would be under users; my user pin number, 141290; I believe the next folder is source; and then repo." *Id.*

The Court relied on Mr. Belcher's testimony. [*See id.* at 37; DE 15, TRO, at 4 ("To his credit, Mr. Belcher has already returned certain information to ICRC's parent company, including the computer where he apparently stored the source code.").

Judge Leichty granted IC's Motion for TRO and ordered Mr. Belcher "to do the following immediately," among other things:

> • "Return to ICRC all source code, files, materials related to the company's financial systems, and any other ICRC documents and materials, including without limitation any electronic copies of source code for any ICRC applications that exist on any external hard drive and any hard copies that might exist." [DE 15 at 9.]

> • "Return ICRC's laptop, cellphone, access card, and any other ICRC property to ICRC…." *Id.*

• "Refrain from accessing, retaining, disclosing, or using ICRC's trade secrets and confidential information, including without limitation its files, source code, and any other such protectible materials." *Id.*

• "Preserve, and not destroy or otherwise alter, all paper and electronic records that concern or relate to ICRC." *Id.*

• "Submit computers utilized in the performance of his employment with ICRC, and any accounts, devices, and storage locations used during his employment or as part of his actions in creating, storing, or removing ICRC property (including PMA and its source code) or utilizing or disabling the company's systems for forensic inspection conducted by ICRC's forensic professionals to review and confirm deletion of all materials." *Id.*

• "Mr. Belcher must file with the court, in writing and under oath, a signed statement (a) that he has returned all ICRC property in his possession, custody, or control to ICRC, (b) that he no longer possesses any ICRC property, (c) that he has removed from any public locations, including LinkedIn, any ICRC trade secrets or other confidential information, and (d) identifying any other site to which or third-party to whom he disclosed ICRC's trade secret or other confidential information." *Id.* at 10.

In sum, Judge Leichty basically ordered Belcher to return all of IC's property, and submit any devices that might have contained IC files on them for forensic review. He cautioned the parties "including Mr. Belcher, that the failure to comply with this order could result in additional sanctions, including without limitation a finding that the party should be held in contempt of court." [DE 15 at 10.]

While Belcher told Judge Leichty that he had sent the materials back to IC on the company's laptop, when IC received the laptop, it discovered there was no hard drive and no IC materials. [DE 37-1.]  By mid-November, IC learned that Belcher changed his story – he now claimed he destroyed the laptop's hard drive with a hammer, lit it on fire, and placed the remains in a garbage bin in a parking lot of a grocery store on

October 19 or 20, 2022 (several days *before* the TRO hearing). [DE 37-5 at 2.]  Belcher's

counsel has admitted in a written memorandum: "It is true Mr. Belcher lied to the court.

He has advised this counsel that he was afraid the court would throw him in jail if it

knew he destroyed the drive." [DE 24 at 3.] Belcher admitted the same in a personal

affidavit: "I was fearful that if I told the court about my destroying the hard drive, I

would go to jail, so I lied to the court." [DE 52-1 at 2.]

Belcher did send IC a USB drive containing materials (including the PMA source

code), and filed a sworn statement that he complied with the TRO. [DE 37-1 at 3; DE 21.]

The Court therefore declined to extend the TRO. [DE 26 at 2.]  At this point in time,

Belcher filed a motion to transfer the case due to improper divisional venue, and the

case was assigned to me.

Once IC got the USB drive from Belcher on November 2, 2022, it began its

forensic investigation.  IC's forensic analysis determined that Belcher had saved 120

files onto the USB drive on October 26, October 28, and November 2, 2022 (all *after* the

TRO had been issued, and the hard drive had been destroyed).  DE 37-1 at 3.  After a

flurry of e-mails between IC's counsel and Belcher's counsel about what IC information

Belcher actually still retained, which were answered evasively from IC's standpoint [DE

37-3 through 37-8], and demands that he turn over all devices he had storing IC

materials, IC continued to believe for some time (maybe even up to the present) that

Belcher was refusing to cooperate and provide information/turn over all devices used

to store IC materials.  IC then filed this motion for contempt. [DE 37.]

On December 15, 2022, Belcher filed his answer and counterclaims and told the Court for the first time, in direct contravention of Judge Leichty's Order, that he kept IC's source code and published it to the United States Copyright Office. [DE 44 at 32.] On December 28, 2022, Belcher admitted that on October 28, 2022, he accessed the PMA source code and added a copyright notice to it. [DE 52-1 at 2.] Belcher also made a copy of the PMA for his attorney to keep in his files. *Id.*

On December 22, 2022, just before Christmas, IC filed for its second TRO. [DE 48.] Following a hearing, I granted the second TRO on January 3, 2023. [DE 56.] IC then filed a motion for preliminary injunction [DE 58]. The injunction hearing was delayed twice (the first time because Belcher filed for bankruptcy, and the second due to a party being unavailable at the last minute), but I finally held a hearing on the motion for preliminary injunction as well as the motion for contempt on August 31, 2023.

During the August 31st hearing, Mr. Belcher testified on the stand that he lied to Judge Leichty during the TRO hearing. Specifically, Belcher conceded he had not shipped the source code on his PC on October 22nd at 9:30 in the morning, as he had told Judge Leichty. Rather, Belcher retained the source code and applied for a copyright on October 28, 2023. Moreover, he shared a copy of the PMA with his attorney, Mr. Zamudio, who still retains it subject to a protective order. Belcher's counsel at the preliminary injunction hearing also admitted on the record that Belcher did not fully comply with the court's order.

6

**Discussion**

A party seeking civil contempt sanctions faces a high bar.  The party must show by clear and convincing evidence that:

> (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply.

*U.S. S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010).  Courts have broad discretion in fashioning remedies for contempt, including fines or an award of attorney fees to the movant.  *F.T.C. v. Trudeau*, 579 F.3d 754, 771 (7th Cir. 2009).  Because IC's motion concerns an alleged violation of a previous order (the TRO entered by Judge Leichty on October 25, 2022), its primary request is for remedial sanctions, meaning the purpose of the sanction would be to compensate IC for losses sustained because of Belcher's disobedience. *Id.* at 771-72.  The contemnor's violation need not be willful; in fact, the Court "may find a party in civil contempt if that party has not been reasonably diligent and energetic in attempting to accomplish what was ordered." *Walton v. First Merchants Bank*, No. 1:17-cv-01888-JMS-MPB, 2019 WL 1589701, at *7 (S.D. Ind. April 12, 2019) (quotation marks and citation omitted).

In this case, IC has met the high burden of showing that Judge Leichty set forth an unambiguous command, and it is abundantly clear that Belcher violated Judge

Leichty's TRO.[1]  First and foremost, Belcher and his attorney have both admitted that Belcher lied to Judge Leichty during the first TRO hearing when he assured the court he had already shipped the laptop back to IC.  At the time of the hearing, Belcher had already destroyed a hard drive and stashed it in a public trash can.  And when he finally did send a USB drive to IC containing the materials that are the subject of this dispute, forensic analysis determined that many files had been saved onto the USB drive on October 26, October 28, and November 2, 2022 — all *after* the TRO was granted.  This action has led IC to believe that Mr. Belcher might have retained another device with IC material on it.  The TRO unambiguously required Belcher to return all of IC materials, ensure he did not retain any IC materials, and submit to IC's forensic team any computers or devices used in connection with IC's systems.  Again, Belcher violated these TRO requirements.  He and his attorney retained IC materials, he declined to submit all devices for forensic examination, and he submitted a sworn statement to the Court stating he complied with the TRO [DE 21] when in fact, he had already violated provisions of the TRO.

Belcher's arguments in opposition to the motion are unavailing.  He argues he reasonably complied with the court's order and because IC's systems are now back up and running, IC is no longer in need of a remedy. [DE 45 at 2-3.]  Lying to a federal

---

[1]  Implicit in Judge Leichty's TRO and his ordering the return of IC's property is the belief that the PMA actually belonged to IC and is likely a trade secret.  While I make no comment on the ultimate issue in this case (who owns the PMA), I do note that Judge Leichty found IC had demonstrated a likelihood of success on the merits regarding its claims for breach of contract and, among other claims, misappropriation under Indiana's Uniform Trade Secrets Act and the Defend Trade Secrets Act. [DE 15 at 8.] I made the same finding when ruling on the second TRO. [DE 56 at 2.]

Judge in court, and then sending the PMA to get copyrighted instead of returning it to IC is not substantially complying with the TRO. Jean-Francois Boudreau from IC testified during the August 2023 hearing about the extreme measures IC had to take to get their system up and running quickly again - somewhere between 10 and 30 IC personnel were involved in trying to get the PMA functional again. Belcher also argues that he took specific steps to comply with the Court's order. [DE 45 at 3.] Again, he returned a laptop with no hard drive, lied about destroying the hard drive, then handed over a USB drive that indicated he had copied IC files after the TRO was in place, then altered the PMA to apply for a copyright on it and filed it with the Copyright Office, and then gave his attorney a copy of the PMA to keep. This absolutely equates to not substantially complying with Judge Leichty's specific orders. To the extent Belcher argues IC hasn't shown he violated an unequivocal command, this is simply inaccurate. IC set forth the terms of the TRO, as I recited earlier in this order, and they are specific and a direct command.

Belcher argues that this is now moot since IC has gotten its system back up and running. [DE 45 at 9.] The fact that IC is back functioning is beside the point. I asked IC to enumerate the attorney and forensic expert fees spent in connection with investigating Belcher's spoliation of the evidence and retention of the PMA, as well as costs involved in preparing the motion for sanctions. The total amount IC claims as damages is $39,104.46 ($32,580.10 in attorney fees and $6,524.36 in fees paid to IC's forensic expert). [DE 115 at 2.] Due to the fact that Belcher has limited financial means

9

and recently filed for bankruptcy, IC is seeking 20% of its damages, or $8,000 in fees and costs. I think this is entirely reasonable and appropriate to grant IC this monetary sanction.

Courts have broad discretion in fashioning remedies for contempt, and they can include fines, attorney fees, and equitable relief. *Fieldwise LLC v. Tegra, LLC*, No. 2:19-cv-80-JVB-JPK, 2021 WL 527504, at *5 (N.D. Ind. Feb. 12, 2021). Monetary sanctions can fall into two categories: (1) they can compensate the complaining party for losses caused by contempt, or (2) they can coerce the contemnor to comply with a court order. *F.T.C.*, 579 F.3d at 769. Here, the goal should be to compensate IC for the time and money it spent trying to determine if Belcher still retained any of IC's materials, if he made any copies of the same, and if he had returned everything in his possession. These things should have been done immediately by Belcher upon issuance of the TRO, thus obviating the need for such extreme measures by IC. However, in addition to lying under oath, Belcher also then retained certain information, made copies to the USB drive, and applied for a copyright. Sanctions are absolutely warranted in the amount of $8,000 to compensate IC for the expenses it incurred in dealing with Belcher's disobedience of the order.

This should go without saying, but I will mention it anyway. Belcher is WARNED that at this point, all of IC's materials including their files, devices, and code should have been returned to IC. If it is brought to this Court's attention that Belcher continues to not comply with the terms of the original TRO, he will be subject to even

stricter sanctions.  Mr. Belcher's counsel may retain a copy of the PMA on a privileged basis.

## Conclusion

For the aforementioned reasons, Illinois Central Railroad Company's Motion for Contempt Sanctions and Attorney Fees [DE 37] is GRANTED.  Plaintiff, Michael Belcher, is ORDERED to pay IC's attorney fees, forensic expert fees, and costs incurred because of his contempt in the amount of $8,000.

ENTERED: September 15, 2023.

/s/ Philip P. Simon
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**