UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ILLINOIS CENTRAL RAILROAD
COMPANY,

                              Plaintiff,

v.                                                    CAUSE NO.: 2:22-cv-353-PPS-JPK

MICHAEL BELCHER,

                              Defendant.

<u>OPINION AND ORDER</u>

Plaintiff, Illinois Central Railroad Company, seeks a preliminary injunction [DE 58, 86] in this case related to the alleged theft of computer code by an employee who was terminated.  Because I find that IC has shown a likelihood of success, they will suffer irreparable harm absent the injunction, and the harm IC will suffer greatly outweighs any harm Belcher will bear if the injunction is granted, this is the unusual case where an injunction is warranted.

**Factual Background**

I held an evidentiary hearing on the motion for preliminary injunction on August 31, 2023.  Here are the facts as adduced at the hearing and supplemented by the parties' briefing: Defendant, Michael Belcher, is a former employee of Illinois Central Railroad Company ("IC").  He worked there from 2002 until he was fired on October 19, 2022. Belcher was proficient in programming languages and a self-taught man.  On his own initiative, he attempted to automate and streamline the company's internal auditing

functions by creating a computer program called the Program Management Application ("PMA"). [Preliminary Injunction Hearing, DE 126, "Tr." at 80-87.] Belcher published the completed PMA on October 8, 2013. [Tr. 84.] Belcher never attempted to copyright the PMA program until after he was sacked by IC. (More on that in a moment).

Belcher's resume reflects that he "maintain[s] data structures, applications and websites that are used to provide daily financial reporting." [DE 58-3 at 35.] Although Belcher claims that he largely created the PMA during his own time at home [Tr. 90-93], IC asserts that it supported his programming by paying for his education and materials to improve his coding abilities, including reimbursing him more than $13,000 for the purchase of books, materials, and courses to improve his programming skills. [DE 58-3 at 3, 10-31.]

Belcher felt under appreciated and under compensated for his work and creation of the PMA. [Tr. 94, 114.] However, from IC's perspective, Belcher received multiple bonus payments in recognition of the programs he maintained and created for IC, including the PMA. [DE 58-3 at 3.] Additionally, Belcher participated in the company's share units plan and was awarded Performance Share Units ("PSUs") [DE 58-3 at 3], which I presume is a form of stock options granted to deserving employees. Each time he was awarded PSUs in January 2019, January 2020, and January 2022, Belcher received and accepted an award letter that contained the following language:

2

> During the course of the Participant's employment with the Company, the Participant will have had access to and will have been entrusted with confidential information relating to the Company, its customers, suppliers and employees (the "Confidential Information"), the particulars of which, if disclosed to competitors of the Company or to the general public, could be detrimental to the best interests of the Company. The Confidential Information is the exclusive property of the Company, and while employed by the Company and at all times thereafter, the Participant will not, without the prior written consent of the Company, (a) reveal, disclose or make known any Confidential Information to any person, or (b) use the Confidential Information for any purpose, other than for the purpose of the Participant performing his or her duties for the Company.

[DE 58-3 at 3, 43.] Of course, these letters came years after the actual creation of the PMA in 2013.

IC claims it has in place multiple safeguards for its assets and intellectual property, including a Code of Conduct that provides:

> CN[1] owns the intellectual property that employees, contractors and agents create while working for CN or using CN resources, regardless of whether such intellectual property has been created on CN's premises or outside of regular work hours . . . you agree that all such intellectual property is owned by CN and agree to transfer or assign ownership to CN and waive any moral rights in favour of CN.

---

[1] IC operates under the trade name "CN," so many of the documents and testimony refer to "CN" rather than "IC."

*Id.* at 68.  Belcher specifically testified that he did not recall signing a Code of Conduct until 2015 (again, well after the PMA was made). [Tr. 116, 118.]  From Belcher's point of view, he had already created the PMA, so he thought it still belonged to him. [Tr. 118.]

By all accounts, the PMA that Belcher created was a home run for IC.  Indeed, the PMA has been accessed and used by thousands of IC employees to support their work for IC.  [DE 58-3 at 4; Tr. 33-34, 89-90.]  Since it was created, Belcher and others at IC have devoted hundreds of normal business hours to improving and maintaining the program. *Id.*

Matters started going south in the relationship between IC and Belcher in September 2022.  It was around that time that several IC employees complained that Belcher had pursued a romantic relationship with a subordinate, he was favoring her as an employee, and Belcher had threatened employees with retaliation if they reported his conduct.  [DE 58-3 at 4-5.]  IC investigated the alleged violations of its policies, and to its mind substantiated the claims.  [*Id.* at 5.]  Once he was confronted with the allegations, Belcher fired off an email to his manager on October 17, 2022.  Here's what his ill-advised missive said:

> This company has failed to do the right thing by me over and over again, as such I am no longer allowing the use of my intellectual properties with out fair market compensation.  I am not relinquishing my position as Financial senior manager and as such it is my duty to inform you that many of our finance systems are no longer functioning.  I will be out of the office for the rest of the day

> but can be reached on my cell phone with a reasonable offer for
> compensation in this matter.  As info the longer this take the higher
> the price, if I am offered something offensive the higher the price.
> Hope that you have a great rest of the day.

*Id.*

IC viewed this email as a stick up — Belcher locked access to the PMA and would only unlock it if IC ponied up some cash.  After receiving the email, IC began investigating its systems and confirmed that Belcher had indeed followed through with his threat; he had removed or stolen (depending on one's point of view) the source code and files across three systems, disabling the use of the applications he had created. [DE 58-3 at 5.]  Belcher testified it was all a misunderstanding borne out of the timing of things; he says he was in the process of transferring access to the PMA to another person when he was locked out of the system by IC (and that is why the PMA was not functioning at the time). [Tr. 122-24.]  I'm highly dubious of that testimony given the specific language he employed in his email that required payment from IC before access to the PMA was returned to the company.  One way or the other, from IC's perspective, the system was down and this greatly affected their ability to function.  IC sent Belcher a letter via email on October 19, 2022, terminating Belcher's employment and demanding he return the company's property and restore its systems. [DE 58-3 at 6.]

When Belcher did not respond quickly enough to IC's demands, it filed suit and sought its first temporary restraining order against Belcher.  This case was originally

assigned to my colleague, Judge Damon Leichty.  Following a hearing at which Belcher falsely assured Judge Leichty he no longer had the source code because it was on the laptop he had shipped back to IC, Judge Leichty issued a TRO on October 25, 2022. [DE 15.]

Judge Leichty found that IC had shown a likelihood of success on its claims that Belcher had misappropriated its trade secrets, committed conversion and trespass, and breached his contractual obligations, and that IC would suffer irreparable harm if Belcher was not compelled to return its materials. [DE 15.]  Among other things, the TRO ordered Belcher to return to IC all source code, files, and materials related to the company's financial systems, refrain from accessing or using IC's trade secrets and confidential information (including the source code), submit computers utilized in the performance of his employment with IC for review by IC's forensic processionals, and file with the court a written statement signed under oath that he had returned all of IC's property in his possession and he no longer possessed any IC property. [DE 15 at 10.]

Belcher sent IC a USB drive containing materials (including the PMA source code), and filed a sworn statement that he complied with the TRO. [DE 21.]  The Court therefore declined to extend the TRO. [DE 26 at 2.] At this point in time, Belcher filed a motion to transfer the case to the Hammond Division due to improper divisional venue, and the matter was assigned to me.

Once IC got the USB drive from Belcher on November 2, 2022, it began its forensic investigation, and determined that Belcher had violated the TRO by retaining IC materials and failing to turn over devices and accounts used to store those materials. [*See* DE 37, Motion for Contempt, at 4-6.]  By mid-November, IC learned that Belcher had changed his story; this one had a "dog ate my homework" feel to it.  He claimed that he destroyed the laptop's hard drive with a hammer, lit it on fire, and put the remains in a garbage bin in a grocery store parking lot on October 19 or 20, 2022 (several days before the TRO hearing). [DE 37-5 at 2.]  When Belcher refused to cooperate and provide information/turn over all devices used to store IC materials, IC filed a motion for contempt and for expedited discovery. [DE 37, 38.]

On December 15, 2022, Belcher filed his counterclaims and told the Court for the first time that he had actually kept IC's source code (in contravention of Judge Leichty's TRO), and published it to the United States Copyright Office in an effort to copyright it. [DE 44 at 32.]  On December 28, 2022, Belcher admitted that on October 28, 2022, he accessed the PMA source code and added a copyright notice to it. [DE 52-1 at 2.] Belcher also made a copy of the PMA for his attorney to keep in his files.  *Id.*

On December 22, 2022, just before Christmas, IC filed for its second TRO. Following a hearing, I granted the second TRO on January 3, 2023, [DE 56], although I

later had to rescind a portion of it because the United States Copyright Office (correctly) noted some problems with some of the language I used in the TRO. [DE 72.]

Presently before me is IC's motion for a preliminary injunction. The injunction hearing was delayed twice (first because Belcher filed for bankruptcy, and the second time due to a witness being unavailable at the last minute). But as I mentioned before, I finally held a hearing on the motion for preliminary injunction on August 31, 2023. Following the hearing, I ordered supplemental briefs addressing the issue of ownership of the PMA and irreparable harm. [DE 117.] Both parties submitted these extra memoranda. [DE 132, 133, 136, 137.] So the motion is fully briefed and ready for a ruling.

### Discussion

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original); *see also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) ("a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it."). "In order to obtain a preliminary injunction, the moving party must show that: (1) they are reasonably likely to succeed on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm the respondent will suffer if the injunction is granted; and (4) the injunction will

8

not harm the public interest." *Joelner v. Village of Washington Park, Illinois*, 378 F.3d 613, 619 (7th Cir. 2004).

The party seeking the injunction must first show a reasonable likelihood of success on the merits of its claims and a sufficiently imminent threat of irreparable harm to it if no injunction is issued. *See Aircraft Owners and Pilots Ass'n v. Hinson*, 102 F.3d 1421, 1424 (7th Cir. 1996). If the moving party meets these two criteria, then the court must balance the harms of erroneously granting or erroneously denying injunctive relief, and must consider the public interest, including the effect an injunction or the absence of an injunction would have on the interests of people not before the court. *Id.* This analysis uses a sliding-scale approach whereby "if the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021).

In other words, if IC can make the initial showing, then I proceed to "a balancing phase" and consider two additional factors: "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied" and "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell*, 990 F.3d at 545. I must equitably weigh these four factors together to determine if a preliminary injunction is warranted. *Id.*; *see also Fire Fighters, Local 365 v. City of E. Chicago*, 2022 WL 456309, at *5 (7th Cir. Dec. 21, 2022).

**I.      Likelihood of Success on the Merits**

"The standard for preliminary injunctive relief requires only a showing of a likelihood of success on the merits . . . ."  *City of Chicago v. Barr*, 961 F.3d 882, 893 (7th Cir. 2020).  A likelihood of success on the merits must exceed "a mere possibility of success."  *Life Spine, Inc.*, 8 F.4th at 540.  As the Seventh Circuit made clear in *Pritzker*, "an applicant for preliminary relief bears a significant burden, even though the Court recognizes that, at such a preliminary stage, the applicant need not show that it definitely will win the case."  *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).  Thus, while IC need not prove its claims at this stage by a preponderance of the evidence, it must demonstrate at a minimum how it proposes to prove the key elements of its case.  *Id.*

This case involves a number of causes of action: breach of contract (Count I); breach of duty of loyalty (Count II); civil conversion (Count III); violation of the Indiana Uniform Trade Secrets Act (Count IV); violation of the Defend Trade Secrets Act (Count V); and trespass to chattels (Count VI).  IC has submitted a lot of briefing on the issue of likelihood of success on the merits, including its supplemental briefing on the issue of ownership of the PMA and whether it has trade secret rights to the PMA. [DE 132; DE 58-1 at 9-13; DE 136 at 2-4.]  IC has established that it has a likelihood of success on the merits.

First, IC has shown how it intends to prove that the PMA is a work made for hire.  Under the Copyright Act, where an employee prepares a work within the scope of

10

their employment, all rights to that work belong to the employer.  17 U.S.C. §§ 101,

201(b).  A work is within the scope of an employee's employment where (a) it is the

kind of work the employee is employed to perform; (b) the work occurs substantially

within the authorized time and space limits; and (c) the work is actuated, at least in

part, by a purpose to serve the employer.  *Bell v. Maloney*, No: 1:16-cv-1193-RLY-DML,

2017 WL 3052827, at *3-4 (S.D. Ind. July 19, 2017), *citing* Restatement (Second) of Agency

§ 228 (1958).

Belcher's own resume reflects that some of his job responsibilities were

maintaining data applications used to provide daily financial reporting, and while in

that role, he developed several applications (including his work on the PMA) that are

being used by IC.  Moreover, it is undisputed that IC paid for Belcher's programming

classes, books, conferences, and other materials to help him improve his programming

skills.  Furthermore, Belcher admitted that the PMA source code was created on his IC

computer [1st TRO Tr., DE 16 at 25] and has only existed on his IC computer.

According to Belcher, he also spent a significant amount of company time over the

ensuing decade maintaining and improving the PMA.  Belcher concedes that he created

the PMA to benefit IC by allowing it to better audit its capital programs. [Tr. 80.]  And

of course everyone agrees that since its creation in 2013, hundreds of employees have

used the PMA to increase efficiency at IC.

IC has established a likelihood of success on the merits of its claim under Indiana's Uniform Trade Secrets Act ("IUTSA") and the Defendant Trade Secrets Act of 2015 ("DTSA").  Both define misappropriation as including the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."  Ind. Code § 24-2-3-3; 18 U.S.C. § 1839(5)(A).  IC plans to prove that the PMA is a trade secret since it is a "design[] . . . program[] or code[]" that is valuable as it gives IC an edge over competitor who lack such proprietary software.  *See* 18 U.S.C. § 1839(3); Ind. Code § 24-2-3-2. They argue Belcher acquired IC's source code and application using improper means – he took them and retained them in breach of his contractual obligations as an employee.  It is also likely IC will be able to prove Belcher breached his employment contract with them by taking the PMA and then apply for a copyright.  For all of these reasons, IC has shown it will likely succeed on the merits.

## II.    Irreparable Harm and No Adequate Remedy at Law

IC must also show that absent an injunction, irreparable harm will ensue.  *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of East Chicago*, 56 F.4th 437, 450 (7th Cir. 2022).  A preliminary injunction is not appropriate to guard against the "mere possibility of irreparable injury."  *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020).  Rather, it must be shown that irreparable harm is likely to ensue absent injunctive relief.  *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Ed.*, 858 F.3d 1034, 1044 (7th Cir. 2017).

12

"Harm is irreparable if legal remedies are inadequate to cure it," meaning "the remedy must be seriously deficient as compared to the harm suffered." *Life Spine, Inc.*, 8 F.4th at 545.

IC has also carried its burden proving irreparable harm. It is true that Belcher testified during the preliminary injunction hearing that he no longer possesses the PMA and after he submitted it to the copyright office, he gave the only other copy to his attorney for safe keeping. [Tr. 126.] But we've heard that story before. Recall that Belcher lied to Judge Leichty — he told him he had already returned the PMA to IC at the time of the first TRO hearing, when in fact he had retained the PMA and spoliated evidence by destroying the hard drive of his IC computer. For several weeks he covered up the fact that he lit IC's hard drive on fire and disposed of it in a dumpster outside of a grocery store, keeping up this pretense even after he submitted a sworn affidavit to the court saying he no longer possessed any of IC's materials and swearing that he did not alter any records that relate to IC. [DE 21.] Belcher then altered the PMA and submitted it to the copyright office. And frankly, his attorney had questionable involvement with this last prank, as he was well aware of the TRO issued by Judge Leichty but still admitted that he advised Belcher to register his program with the copyright office. [Tr. 142-43.] It is for all these reasons, as well as his demeanor while testifying, that I look askance at his assurances that he no longer possesses any of IC's materials.

13

What's more, let's assume that I take Belcher at his word that he no longer has any IC materials including a copy of the PMA.  If that is so, then why not stipulate to the entry of an injunction?  In other words, what's the point of fighting an injunction that prevents him from using something that he does not have?  I raised that question to Belcher at the hearing.  But he still fought entry of the injunction—which of course is his right.  But if Belcher truly does not have any IC materials in his possession right now, including the PMA, then why would he not just agree to the terms of the injunction?  His refusal is telling.

For its part, IC tells me that potential disclosure of the PMA risks losing its trade secret, the loss of the competitive advantage that the PMA provides, and significant damage to its reputation as a company customers can trust. [DE 58-1 at 22.] Case law supports this stance.  *See Badger Daylighting Corp. v. Palmer*, No. 1:19-cv-0216, 2019 WL 4572798, at *11-12 (S.D. Ind. Sept. 20, 2019) (finding irreparable harm existed, and a preliminary injunction was  appropriate, where there was actual or threatened disclosure of a trade secret); *Toyota Indus. Equip. Mfg., Inc. v. Land*, 1:14-cv-1049, 2014 WL 3670133, at *8 (S.D. Ind. July 21, 2014) (same).

### III.    Balancing Test

Having found IC satisfied its burden on the first two factors, I now move on to the balancing phase in determinating whether a preliminary injunction is warranted. The balancing test has been defined as weighing "the irreparable harm risked by the

moving party in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving party if the preliminary injunction is granted." *Girl Scouts*, 549 F.3d at 1100.  The only harm Belcher raised during the hearing was that if an injunction was ordered, he would be unable to show the PMA to potential employers. [Tr. 126-27.]  But this statement begs the original question here.  I mean, Belcher has already said he doesn't have the PMA or anything else of IC anymore.  So how could he possibly present the PMA to a potential employer anyway?  If he were truly hoping to do so, that is a stark reason this injunction should be granted.  And if he really doesn't have the PMA and could not disclose it to a potential employer anyway, then Belcher faces no harm by the institution of an injunction.  Moreover, I don't see any harm to the public in granting this injunction either.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  Because I simply distrust Belcher's assurances that he no longer has the PMA and the only copy is being retained by his attorney on a confidential basis, the most prudent course of action to keep the status quo while waiting for a trial on the merits is to grant the preliminary injunction.

Finally, I note that a district court has the discretion to issue a preliminary injunction without the posting of a security bond.  *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972).  A bond is not necessary for a preliminary injunction to take effect.  *See,*

*e.g., Wayne Chemical, Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977).

In this case, there is no evidence that Belcher will suffer any monetary injuries.

Additionally, IC already posted $2,500 as a security bond for the initial TRO. [DE 15 at

10.]  So no further bond is required.

## Conclusion

For the above-referenced reasons, Plaintiff's Motion for a Preliminary Injunction

[DE 58] is GRANTED.  The terms of the injunction will be set out in a separate order.

ENTERED: November 6, 2023.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT