UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| ILLINOIS CENTRAL RAILROAD COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) | CAUSE NO. 2:22-CV-353-PPS |
| | ) | |
| MICHAEL BELCHER, | ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Defendant, Michael Belcher, created a computer program called the Program Management Application ("PMA") to give him a leg up performing his job at Illinois Central Railroad Company ("IC") in the finance department. The program became hugely popular and widely used by IC's employees for years. But chaos erupted when Belcher was investigated for an inappropriate relationship with a subordinate, and he basically disabled the PMA, hobbling IC in the process. Belcher then sent a note to IC that can fairly be described as extortionate — IC needed to pay him for the PMA or otherwise risk further damage to its systems. Instead of acceding to his demands, IC scrambled to get their operating system back up and running, and filed this lawsuit against Belcher. Among other things, IC sought a temporary restraining order, demanding Belcher return the PMA sourcecode, which he took with him on his way out the door. After this suit was initiated by IC claiming a slew of state and federal claims and an injunction, Belcher filed a counterclaim for copyright infringement, claiming the

computer program he created belongs to him.

Presently before the court are cross motions for summary judgment. Belcher has moved for summary judgment on his counterclaim [DE 202], and IC has moved for summary judgment on Belcher's counterclaim as well as IC's claims for breach of contract, breach of the duty of loyalty, state and federal trade secret misappropriation, conversion, and trespass to chattels. [DE 194 at 9.] Additionally, IC filed a motion for evidentiary sanctions relating to the alleged destruction of evidence by Belcher. [DE 208.]

In a nutshell, for the reasons detailed below, I conclude that Belcher's copyright claim is time barred. Additionally, IC has established that the work for hire doctrine applies here meaning IC owns the PMA. Summary judgment is therefore warranted in favor of IC on Belcher's counterclaims under the Copyright Act. As for IC's affirmative claims, summary judgment is appropriate on its breach of contract claim. But as will be discussed below, IC's remaining claims must be decided by a jury.

**Factual Background**

The facts are largely uncontested. Belcher worked at IC from 2002 until he was terminated in 2022. Around 2012, he became an Assistant Project Officer ("APO") in the engineering department, responsible for extracting data from IC's financial systems and analyzing it. [DE 194 at 9; DE 195-1 at 5-6.[1]] According to Belcher, he "collect[ed] the

---

[1] For consistency, citations to the record refer to the blue CM/ECF page numbers found at the top of each filing. Additionally, the Court discovered some deposition pages cited to by IC in its memorandum and statement of facts were missing from the

data that encompassed all of the charges to a given capital project. You'd then validate that they belong to that capital project." [DE 204-10 at 5.] Belcher thought there was a way to make his job easier. So he created the PMA to make his work as an APO more efficient. [DE 194 at 9.] According to other project officers, an APO would not typically be tasked with creating/writing such a computer program [DE 204 at 2-3], but this was something Belcher took on himself.

There is some conflicting testimony about whether Belcher created the PMA on his personal computer or on his IC laptop, and whether he created the code at work or at home, so I'm going to go through this evidence carefully. During his deposition, Belcher testified as follows:

> Q. You created the PMA on a CN$^2$ computer. Is that right?
>
> A. No, I created the PMA on my personal laptop at home.
>
> Q. So when you said at the first temporary restraining order hearing to Judge [Leichty], when I built these systems, I built them on my work computer, that was a lie?
>
> A. No. There's a lot of systems, so the vast majority of systems were built on CN's computer because it was required to, right? PMA wasn't required to, but working in SSIS and SQL, I had to have - - I had to be on CN's VPN, right? So the vast majority of all the back-end work, which I left intact and have no testing over, that stuff is what I worked on.

[DE 227-1 at 60.]

_____

record, so at the Court's request, IC submitted Belcher's full deposition transcript under seal at DE 227-1.

[2] IC operates under the trade name "CN," so many of the documents and testimony refer to "CN" rather than "IC."

During the TRO hearing before Judge Leichty, Belcher stated that the source code "was on CN's PC, which I shipped on October 22nd." [1ˢᵗ TRO Tr., DE 195-8, at 10.] During that same hearing, Belcher claims that he "used CN's PC, but [he] built [the PMA] on [his] own time at home." [*Id.* at 5.]  Jean-Francis Boudreau, Assistant Vice President Financial Planning at Canadian National Railroad Company (a parent company of IC), and the person Belcher reported to, stated that IC gave Belcher a special laptop with unique access so that he could code with it. [1st Boudreau Tr., DE 198, at 18-19.]  In addition, Belcher's own lawyer wrote in a letter to IC's counsel stating that, "Defendant only used his work PC for [sic] and shipped it on October 22nd. . . Therefore, he has submitted computers utilized in the performance of his employment with ICRC, and any accounts, devices, and storage locations used during his employment or as part of his actions in creating, storing, or removing alleged ICRC property (including PMA and its source code) . . . " [Letter from Zamudio, DE 21-1, at 3.]  Belcher testified the same during the preliminary injunction hearing.  When asked "[w]as any of the PMA development ever done on your personal computer or just the research part?" he answered, "[y]eah.  I'm sure that I dabbled with it on my personal PC as well, but, primarily, it was done on the CN computer as far as writing the code because you don't want to have a fractured code in different places." [PI Tr., DE 126, at 101.]

And finally, during his deposition which was taken later in this case, Belcher then insisted that he did not do *any* work at CN related to the PMA, "unless you

consider the databases behind it, but I don't.  That wasn't the PMA.  That was the data."
[DE 204-19 at 1.]  According to Belcher, none of his work at IC was related to the PMA.
*Id.*  However, Boudreau spoke to other IC employees and believes Belcher did not
create the PMA on his own time at home. [DE 195-14 at 5.]  Boudreau understood that
Belcher attended programming classes outside of business hours, but believes he
performed most PMA coding at the office during business hours. [*Id.* at 3-5.]

This world of computer-programming is not intuitive so it is important to look at
what the PMA program actually accomplishes.  The PMA handles the first half of an
APO's duties by automatically extracting data from IC's financial systems, allowing the
APOs and other employees to skip straight to the analysis portion of their job. [DE 193
at 6.]  It consists of a "front end," which is the program that users open and interact
with, and a "back end," which comprises the mechanisms through which the program
interacts with IC's databases, pulls information from those databases, and brings it to
the front end for display.  *Id.*  The front end can't function without the back end because
it relies on the information collected by the back end; therefore, the front end can't
function by itself if removed from IC's data systems. [*Id.* at 6-7.]

Belcher began working on the PMA in 2012. [DE 193 at 5.]  In Spring 2013, he
started taking computer courses to improve his coding skills, for which IC paid 90% of
his tuition costs. [DE 194 at 10.]  IC also reimbursed him more than $13,000 for the
purchase of books and materials to improve his programming skills.  *Id.*

Belcher published the PMA on October 8, 2013, by putting the application files in

a shared folder on IC's internal system for other employees to use. [DE 197 at 21-22.]

He did not include a copyright notice, and at least originally Belcher did not indicate in

any way to IC that he believed he owned the PMA. [DE 194 at 10; Belcher Tr., DE 227-1

at 271; DE 193 at 9.]  Belcher eventually created a manual to teach IC employees how to

use the PMA. [DE 193 at 9.]  In that PMA Manual, Belcher used his IC work email

address and IC work telephone number as his contact information. [Belcher Tr., DE 227-

1 at 167-68.]

His program was, by all measures, wildly successful.  Since that time, hundreds

(if not thousands) of IC employees now use the PMA every year, and IC has invested

numerous hours improving and maintaining the PMA. [DE 194 at 10; DE 193 at 12-14.]

Boudreau specifically attested that "in the nine years since the PMA was initially

created, Mr. Belcher and other IC employees have all dedicated hundreds of hours

during standard work periods to improve and maintain the PMA." [DE 195-14 at 5; *see

also* DE 193 at 13.]  Additionally, Boudreau believes "[t]he vast majority of work

performed on the PMA over the past nine years has occurred during normal business

hours." [DE 195-14 at 5.]  Belcher testified that his work fixing the PMA's back end

generally occurred in IC's offices during normal working hours — "I tried to do all the

data work on normal working hours because the data is CN's property." [Belcher Tr.,

DE 227-1 at 135-36.]

In recognition of his creation of the PMA, Belcher received multiple bonus

payments and PSUs (Performance Share Units) and he was promoted several times

6

from 2012-2022. [DE 193 at 15.]  Each time IC awarded Belcher PSUs, he received and accepted an award letter confirming that all the confidential information relating to IC is the exclusive property of IC. [*Id.* at 4.]  Belcher remembers signing some of the award letters. [Belcher Tr., DE 227-1 at 14.]

Additionally, Belcher was asked to review and sign IC's Code of Conduct on a yearly basis.  Although Belcher does not remember signing every year (but does acknowledge he signed the code of conduct some years), IC has Belcher's electronic acknowledgment of his obligations under the Code of Business Conduct for 2007-2009, 2012-2023. [DE 195-1 at 3; DE 195-15 at 3; DE 227-1 at 15.]  The Code of Business Conduct provides, in pertinent part:

> CN owns the intellectual property that employees, contractors and agents create while working for CN or using CN resources, *regardless of whether such intellectual property has been created on CN's premises or outside of regular work hours* . . . You agree that all such intellectual property is owned by CN and agree to transfer or assign ownership to CN and waive any moral rights in favour of CN.

[DE 195-1 at 195-96 (Emphasis added).]

After he created the PMA, Belcher added to his resume that he "developed an application that is being used to this day to test programs as well as to display transaction information in the field" and that "his job responsibilities at IC included [m]aintain[ing] data structures, applications and websites that are used to provide daily financial reporting" and "[w]hile in this role I developed several websites and applications that are used by varying audiences." [DE 195-14 at 3-4.]

Despite the foregoing strong indicia that IC owns the PMA, Belcher testified during his deposition that he did not think IC owned the PMA. [DE 204-5 at 1.]  Belcher claims he was content letting CN use the PMA for a while, but never thought ownership was an issue. [DE 227-1 at 54.]

In 2015, Belcher considered registering the PMA as his property with the U.S. Copyright Office (he ended up deciding not to), and spoke with his coworker, Tai Schuler about it. [DE 194 at 11.]  Belcher concedes that Schuler told him that Belcher "would have a hard time owning it because of CN's code of conduct, and [Belcher] disagreed with him." [DE 197 at 37.]  Schuler said he "disagreed repeatedly strongly" when he talked with Belcher about Belcher owning the PMA. [DE 195-4 at 13.]

In 2022, IC started investigating complaints about Belcher's romantic relationship and favoritism toward a subordinate. [DE 194 at 11.]  As the investigation was nearing an end, which was going to result in Belcher's termination, Belcher evidently decided that the best defense is a good offense; he disabled the PMA and several other systems and sent the following note to IC:

> This company has failed to do the right thing by me over and over again, as such I am no longer allowing the use of my intellectual properties with out [sic] fair market compensation.  I am not relinquishing my position as Financial senior manager and as such it is my duty to inform you that many of our finance systems are no longer functioning.  I will be out of the office for the rest of the day but can be reached on my cell phone with a reasonable offer for compensation in this matter.  As info the longer this takes the higher the price, if I am offered something offensive the higher the price.  Hope that you have a great rest of the day.

[DE 195-13 at 4.]  Mr. Boudreau spoke to Belcher after receiving this e-mail and told

Belcher that whatever he took belonged to IC, that it must be returned, and that Belcher would likely face serious consequences for his actions. *Id.* Belcher replied that he "knew what he was doing" and would "see you in Court." *Id.*

"In Court" was precisely where they next met. Here's how that came about: IC sent Belcher a letter via email on October 19, 2022, terminating Belcher's employment for cause and demanding Belcher return the company's property and restore its systems. [DE 195-13 at 4.] As IC scrambled to get its systems back online, it learned Belcher had embedded two "kill switches" to prevent them from working. [DE 193 at 18-19.] Eventually, Boudreau testified that the IT department did a kind of "reverse engineering" so they were able to recreate the code and get the existing system back up and running. [DE 204-8 at 1.] The shutdown was the impetus for IC to file the complaint in this action and its motion for a TRO, which was originally assigned to my colleague, Judge Damon Leichty. During the hearing before Judge Leichty, Belcher repeatedly told the Court he no longer possessed IC's source code and related materials because he shipped them back to IC on his company-issued laptop. [DE 22-2, TRO Tr., at 30-32.] Judge Leichty nonetheless granted the TRO and basically ordered Belcher to return all of IC's property. [DE 15.]

Belcher unquestionably lied to Judge Leichty during the TRO hearing. Indeed, both he and his attorney admitted as much. [DE 24 at 3; DE 52-1 at 2.] To make a long story short, Belcher returned IC's laptop but it was missing two hard drives—which Belcher destroyed with a hammer before lighting it on fire and placing it in a garbage

9

bin in a parking lot of a grocery store several days before the TRO hearing. [DE 209 at 2.]

These actions are at the root of IC's motion for evidentiary sanctions under Federal Rule of Civil Procedure 37(e). [DE 208.] IC asks the Court for an adverse factual inference that the PMA source code was created and stored on IC's computer since Belcher destroyed the computer's hard drives making it difficult to disprove his current claim that he used his personal computer to store and create the PMA. Because of Belcher's egregious conduct at the beginning of this litigation including lying in open court to Judge Leichty and his destruction of the IC laptop hard drive, I could readily grant IC's motion for evidentiary sanctions under Rule 37(e) [DE 208] and impose an adverse inference that Belcher did not create the PMA on his personal laptop. However, Belcher loses on the merits anyway—it is clear as explained below that IC owns the PMA as a work for hire under the Copyright Act.

Finally, before getting into an analysis of the claims, there is one more background matter to discuss relating to Belcher's counterclaim. After the first TRO hearing, Belcher informed IC that he had in fact kept the source code and intentionally published it to the United States Copyright Office on December 7, 2022, contrary to what he told Judge Leichty. [DE 120 at 28; DE 204 at 4; DE 193 at 20-21.] According to Belcher, CN never paid him any royalties, and he never demanded any from CN prior to 2022 because "[i]t made my job easier, and I was content with how things were going." [DE 204-5 at 1.] Belcher stated that after the PMA was built, he talked with

Shau Levandier from CN's engineering/IT department, and Levandier said it would have cost CN $5 million to build the PMA. [DE 204-33 at 1.] This is what forms the basis of Belcher's counterclaim for copyright infringement which he filed on December 15, 2022, requesting "a sum of at least $3,000,000.00." [DE 44 at 33.]

### Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On cross motions for summary judgment, I need to assess whether each movant has satisfied the requirements of Rule 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005); *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n. 4 (7th Cir. 2008). "As with any summary judgment motion, [the Court] review[s] cross-motions for summary judgment construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party." *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (internal quotation marks omitted).

## I.    Belcher's Motion for Summary Judgment

Belcher has two counterclaims: copyright infringement under 17 U.S.C. §§ 101 *et seq.* (Counterclaim 1), and a constitutional challenge to 17 U.S.C. §§ 101, 201(b) (Counterclaim 2). [DE 134.]

11

The first counterclaim is time barred. The Copyright Act provides that "[n]o civil action shall be maintained ... unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). A claim for ownership "accrues only once, and if an action is not brought within three years of accrual, it is forever barred." *Roger Miller Music, Inc. v. Sony/ATV Publ'g*, 477 F.3d 383, 390 (6th Cir. 2007) (quoting *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996)).

The statutory period for an action to establish ownership begins to run whenever "the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his rights[.]" *Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004); Nimmer on Copyright § 12.05. Notice can occur when anything happens to put the party on notice that another is using the copyrighted work in a way that would constitute infringement, including use without an agreement or payment of a royalty. *See LeSea, Inc. v. Lesea Broad. Corp.*, 3:18CV914, 2022 WL 621039, at *3 (N.D. Ind. Mar. 3, 2022) ("Awareness that one is not receiving royalties also puts one on notice of the basis for a copyright co-ownership claim."); *Cooper v. NCS Pearson, Inc.*, 733 F.3d 1013, 1017 (10th Cir. 2013) (same); *Everly v. Everly*, 958 F.3d 442, 452 (6th Cir. 2020) (same); *Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik*, 510 F.3d 77, 90 (1st Cir. 2007). It can also occur when "the work is published but the plaintiff is not appropriately credited." *Estate of Worrell v. Thang, Inc.*, No. 22-11009, 2025 WL 2552162, at *4 (E.D. Mich. Sept. 4, 2025)*; see also Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011) (putative author's claim repudiated by publication of book without listing her as author).

12

There is no dispute that Belcher published the PMA back in 2013. It was quickly adopted by IC and hundreds of employees started to use it on a daily basis. Belcher obviously was aware of this—he worked at IC and knew what programs it was using and what was happening in the company. If one needs more evidence of his awareness, they only need to look so far as his May 2020 email forwarded to Tai Schuler touting the fact that the "PMA has been used for over 7 years! It averages around 1k logins per month." [Belcher Tr., Dep. Ex. 3, DE 195-1 at 271.]

Unquestionably, Belcher was well aware of IC's use of the PMA in 2013, and that he never received any royalties for it or discussed entering a license agreement. [DE 210 at 6.] Such use without an agreement would have been infringement if Belcher owned the PMA; therefore, he had until 2016 to bring suit to assert his ownership and failure to do so dooms his copyright counterclaim. *LeSea*, 2022 WL 621039, at *3; *Cooper*, 733 F.3d at 1017; *Mahan v. Roc Nation, LLC*, 634 F. App'x 329, 331 (2d Cir. 2016) (granting summary judgment where plaintiff's failure to receive royalties created notice of ownership claim).

If Belcher believed he owned the PMA (as he claims), there are other examples of things he was cognizant of that show someone was allegedly violating his rights since 2013. Every year, Belcher acknowledged IC's Code of Conduct providing that "IC owns the intellectual property that employees . . . create while working for IC." [DE 210 at 6.] Plus, the PMA was published to other IC employees without naming Belcher as the owner or author. Moreover, IC acted as the PMA's owner by exercising control over

the PMA. This included: 1) directing Belcher to provide access to IC employees and its outside auditors; 2) preparing reports on the PMA, fixing it when it was not working, adding functionality, and preparing a PMA Manual; and 3) having Belcher fly around the United States and Canada teaching IC employees how to use it. [DE 210 at 7.] *See Kwan*, 634 F.3d at 229 (putative author's claim repudiated by publication of book without listing her as author); *Cooper*, 733 F.3d at 1016-17. Additionally, Belcher himself testified that his coworker, Tai Schuler, put him on notice in 2015 and 2016 by telling him that "the code of conduct would preclude [Belcher] from ownership." [DE 210 at 7.]

Belcher tries to claim he had no notice of IC's intention to own the PMA before 2020 because, according to Belcher, there was no earlier "express and unambiguous contest of ownership made by CN to put Mr. Belcher on notice." [DE 203 at 10.] In support of his argument, Belcher quotes the deposition of Boudreau, who in response to the question, "[w]hen did you find out for the first time that Mr. Belcher believed he owned the PMA?" answered, "I would say almost annually when it was compensation time. . . . Mike alluded to the fact that he felt he has been underpaid and that he's never been recognized or paid for the PMA." [DE 203 at 10 (quoting Boudreau Dep.).] But this answers the opposition question - when was *IC* on notice that Belcher might have thought he owned the PMA, not when Belcher *himself* was on notice that IC believed it owned the PMA (which is the proper legal question to ask). As shown above, Belcher was on notice of IC's purported ownership starting back in 2013 because: IC used the PMA without paying royalties; Belcher's signing of the Code of Conduct and PSU

Agreements; IC published the PMA on its servers without crediting Belcher; Belcher's

co-worker told him IC owned the PMA; and IC acted as the owner and helped maintain

and upgrade the program.

Nothing in *Consumer Health Info. Corp., v. Amylin Pharms., Inc.*, 54 F.Supp.3d 1001

(S.D. Ind. 2014), the only case relied on by Belcher, mandates a different result. Belcher

points to *Amylin* in support of his position that he didn't know until 2020 that IC

believed it owned the PMA. [DE 203 at 10-11.] *Amylin* involved a disagreement in the

pharmaceutical industry—the plaintiff was retained to develop a patient-compliance

strategy for a certain drug. During the negotiations, the parties entered into a master

service agreement whereby the plaintiff purported to assign its interest in the

copyrighted materials to Amylin. The court found the dispositive issue in the case was

ownership, not use, since the plaintiff acknowledged in its complaint that the

defendants had been using the copyrighted materials for the past seven years. *Id.* at

1009. The Court therefore found "the statute of limitations with respect to ownership

actions controls in this case." *Id.* The plaintiff had waited seven years to bring the

infringement claim, now claiming they were the rightful owners of the copyrighted

materials. *Id.* Although the plaintiff attempted to carve out an exception under the

"work-for-hire" definition, the Court found "the Agreement clearly states that all

materials created under the Agreement are property of Amylin." *Id.* at 1010. Thus, the

Court found that "[plaintiff] was on notice back in 2006 that Amylin claimed an

ownership interest in the copyrighted materials by the terms of the Agreement, and any

15

challenge to their ownership was required to be brought within three years of the date of the Agreement." *Id.* at 1010.

Belcher claims this case supports his cause because *Amylin* involved an express and unambiguous assignment of copyright ownership, and he claims there was no express and unambiguous contest of ownership made by CN until after 2020 to put Belcher on early notice here. That's not accurate. There are two things in writing that do just that—the Code of Conduct and the signed PSU Agreements. Moreover, nothing in *Amylin* states there *must* be a signed assignment of rights to put a supposed owner on notice. That just happened to occur in that case and the court found it put the owner on notice. If anything, *Amylin* helps IC because that court ultimately found the copyright claim was barred due to the statute of limitations, as IC is arguing here.

Belcher's second counterclaim asserts the Copyright Act is unconstitutional [DE 134 at 11-14]. This claim is frivolous. As IC notes, courts around the country have confirmed that the Copyright Act is a proper exercise of Congress' power and the Supreme Court and Seventh Circuit have repeatedly addressed the work for hire provision and never once questioned its constitutionality. *See, e.g., Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 631 (7th Cir. 2003); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 750-51 (1989); *Stewart v. Abend*, 495 U.S. 207, 254 (1990).

In his response brief, Belcher modulates his position, stating he is not contending that the Copyright Act is facially unconstitutional [DE 212 at 14], and conceding the work-for-hire doctrine passes muster. [*Id.* at 15.] Instead, his real argument is that "the

16

work-for-hire provision is constitutional" only with "an employee's implicit consent,"

and because Belcher did not consent to CN's use of his work, "if the copyright act

imputes implied consent to him under 201(b), it is unconstitutional to him." [*Id.* at 16.]

This is all a bit confounding, but to the extent Belcher's concept of "implicit consent" is

met by the requirements of the three-pronged work-for hire test applied by courts

around the country, including the Seventh Circuit (as discussed in detail below),

Belcher seems to concede that the work-for-hire test is constitutional and this claim fails.

To the extent he is arguing that the work-for-hire test is unconstitutional, he provides

no legal support whatsoever, and this position is contradicted by binding precedent.

*See, e.g., Chicago Bd. Of Educ.*, 354 F.3d at 631; *Reid*, 490 U.S. at 750-51; *Stewart*, 495 U.S. at

254.

In sum, Belcher's affirmative motion for summary judgment on his claims under

the Copyright Act is denied.

## II.    IC's Motion for Summary Judgment

As noted above, IC seeks summary judgment on Belcher's copyright claims. In

addition, IC also seeks summary judgment on its affirmative claims for breach of

contract; breach of the common law duty of loyalty; civil conversion; violation of both

the Indiana and federal trade secrets acts; and trespass to chattels. [DE 1 at 9-14.] I will

take up each of these arguments in turn below.

### A. Belcher's Copyright Claims

Let's start with looking at whether IC is entitled to summary judgment on

Belcher's copyright claims.  First, as discussed above, IC is entitled to summary judgment on Belcher's copyright counterclaim because it is barred by the applicable statute of limitations.  And there is another reason IC must prevail on this claim: it is clear that IC owns the PMA as a work for hire under the Copyright Act.  The Act provides, in pertinent part, that a "work made for hire" is a "work prepared by an employee within the scope of his or her employment."  17 U.S.C. § 101.  Absent an express written agreement to the contrary, the employer is the author of a work for hire. 17 U.S.C. § 201(b) ("[i]n the case of a work made for hire, the employer or other person from whom the work was prepared is considered the author . . . and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.").

Belcher responds that "the PMA does *not* qualify as a work made for hire" – because he independently created the PMA in his own time, using his own resources, and for himself, and he just "allowed others at CN to use his PMA." [DE 212 at 13, 3 (emphasis added).]  Belcher's claim that this isn't a work for hire is easily disproved by the undisputed evidence in the record.

There is a three-pronged test to determine if a work is for hire: (1) it is the kind the employee is employed to perform; (2) the work occurred substantially within authorized time and space limits; and (3) it was actuated, at least in part, by a purpose to serve the employer.  *Sumrall v. LeSea, Inc.*, 104 F.4th 622, 628 (7th Cir. 2024) (affirming summary judgment in favor of employer).

18

Let's turn to the first prong. Belcher claims coding the PMA was not part of his job with CN. Thus, it wasn't the kind of work he was employed to perform. [DE 216 at 3.] Perhaps not at first, but over time it certainly developed into that. In other words, while it is clear Belcher was not originally hired specifically for his computer programming prowess, and his job did not require him to write a computer program, it is also clear that Belcher developed the PMA to make his job easier. He didn't create a program application for some outside interest of his, or a hobby. Rather, Belcher admits he created the PMA to make his job easier and he used it (as well as shared it with co-workers) during his employment. Belcher's own resume states his job responsibilities at IC included "[m]aintain[ing] data structures, applications and websites that are used to provide daily financial reporting" and "[w]hile in this role I developed several websites and applications that are used by varying audiences"—one of which was the PMA. [DE 195-14 at 3-4. ] Belcher himself conceded in a response to expedited discovery that while he was working at IC, "[h]is duties included writing software code." [DE 46 at 1.]

Even though Belcher's job largely entailed analyzing financial data, the function of the PMA was directly related to his duties as an APO and helped him do his job faster. As the Court found in *Lewis v. Activision Blizzard, Inc.*, 634 F. App'x 182, 184 (9th 2015), in affirming summary judgment finding recordings were work made for hire, "[e]ven if [defendant's] day-to-day duties primarily consisted of customer service within World of Warcraft, that does not mean that her duties did not also include assisting with the creation of content."

19

This case is very similar to *Rouse v. Walter & Assocs., Inc.*, 513 F.Supp.2d 1041, 1057 (S.D. Iowa 2007). There, the defendant claimed he was "a scientist, not a programmer," while he worked for the Department of Animal Science. But his own testimony revealed he had programmed software in performing his work for the Department of Animal Science, and his curriculum vitae listed that he developed software products for animal ultrasound researchers. The *Rouse* court found "there exists no genuine issue of material fact that the development of [the software] was within the scope of duties [defendant] was hired to perform." *Id.* at 1057.

Other courts have found the same thing—even though an employee might not have been hired to perform development of software, where that creation occurred within the scope of the employee's employment, it can be deemed work of the kind the employee was hired to perform. *See Genzmer v. Pub. Health Trust of Miami-Dade Cnty.*, 219 F.Supp.2d 1275, 1280-81 (S.D. Fla. 2002) (employee was required to undertake a research assignment that encompassed "a myriad of activities" and the evidence showed that at times such research included the drafting of computer programs); *Miller v. CP Chemicals, Inc.*, 808 F.Supp. 1238, 1243 (D.S.C. 1992) (although employee was not hired primarily to develop software, the development of computer programs was at least incidental to his job responsibilities because he was responsible for the organizing and updating of the laboratory).

While Belcher argues computer programming was not within the scope of his employment because it wasn't within his job description, this type of argument has

been rejected by other courts. *See, e.g., Le v. City of Wilmington*, 480 F. App'x 678, 683 n. 5 (3d Cir. 2012) ("[Plaintiff] argues that it was not within the scope of his employment because his job description did not list computer programming as the work that he was employed to do. We find such a narrow position regarding the scope of employment unpersuasive."); *Genzmer*, 219 F.Supp. 2d at 1281 ("Although it is true that the plaintiff in this case was hired as a doctor, not as a computer programmer, it does not necessarily follow that writing a computer program is not the type of work Genzmer was employed to perform.").

Belcher himself testified that his duties as an APO were "to collect data and audit for capital plans" and that "the APO position was more retrieving data and more time spent retrieving data than viewing it." [DE 194 at 21.] And the PMA aids the specific duties that Belcher was in charge of as being an APO. (*See* Schuler Dep., DE 200 at 10 (who stated the PMA exists because "its purpose is . . . to carry out the APO job first.")). Thus, the PMA was directly related to Belcher's job responsibilities and indeed assisted him in doing his job. *See, e.g., Miller*, 808 F.Supp. at 1243 ("Miller was not hired primarily for the development of computer programs. However, as supervisor of the quality control laboratory, he was responsible for the organization and updating of the laboratory. Thus, the development of the computer programs was at least incidental to his job responsibilities . . . ."). Accordingly, IC has satisfied the first prong of the test— the work qualifies as the kind that Belcher was employed to perform.

IC has also satisfied the second part of the work for hire tests— whether the

21

work occurred substantially within an authorized time and space limit. As I laid out earlier in the opinion, there is plenty of evidence that Belcher worked on coding the PMA at IC's offices during business hours. But there is also evidence (largely from Belcher himself) that he spent time coding at home after hours, taking classes (but paid for by IC), and that at least some of the work was done on Belcher's personal laptop. But this factual dispute is not *material* to the outcome of the work-for-hire test.

Given modern technology and the work-from-home culture that has emerged over the years, in this day and age plenty of employees do legitimate work from home for their employers, in what would have previously been considered as "off hours." This has been recognized by courts for quite some time—that creating something at home isn't dispositive. (Indeed, I'm presently drafting this opinion from home and it sure feels like a work for hire). *See, e.g., Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 571 (4th Cir. 1994) ("When that [first] element of the *Restatement* test is met, courts have tended not to grant employees authorship rights solely on the basis that the work was done at home on off-hours."); *Fleurimond v. New York Univ.*, 876 F.Supp.2d 190, 201 (E.D.N.Y. 2012) (finding "not all three elements are given equal weight" and quoting cases showing the second element can be considered less); *In re Simplified Info. Sys., Inc.*, 89 B.R. 538, 542 (W.D. Pa. 1988) ("Cannon was the Debtor's President when he wrote the program; that he wrote it during 'off' hours, or at his other business facility is not relevant"); *Le v. City of Wilmington*, 736 F.Supp.2d 842, 849 (D. Del. 2010) (even "if Le created the Work on his own time, if he did so during his employment and without a

specific written agreement to the contrary, the copyright on the Work belongs to the City"); *Marshall v. Miles Lab'ys, Inc.*, 647 F.Supp. 1326, 1330 (N.D. Ind. 1986) ("Neither case law nor the legislative history suggests that a person can avoid the 'work made for hire' doctrine merely by preparing the work during non-working hours or in a facility not controlled by the employer.").

Here, I think the most important thing is that Belcher created the PMA while he was employed by IC and working for them, and he did it to make his job as an Assistant Project Officer more efficient. *See, e.g., Genzmer*, 219 F.Supp.2d at 1281-82 (finding "[w]hat matters is that Genzmer performed the work during the time period in which he was employed by the Trust to complete the research program" when party argued "he wrote the software at issue in his home, using his home computer, during off-duty hours"); *Relate LLC v. Jones*, No. 05-0176-CV-W-FJG, 2005 WL 8159055, at *5 (W.D. Mo. Apr. 14, 2005) ("[W]here the employee is <u>salaried</u>, a work completed during off-hours and/or at the employee's home may still be considered a work made for hire.") (emphasis in original); *Miller*, 808 F.Supp. at 1243 (holding employer satisfied second element, even though employee "worked primarily, if not entirely, on the computer programs at his home on his own time" because "the work was performed during the time period in which he was employed by CP"); *Siniouguine v. Mediachase Ltd.*, CV 11-6113-JFW AGRX, 2012 WL 2317364, at *8 (C.D. Cal. June 11, 2012) ("[The 'time and space limits' factor has been deemed unimportant in the computer programming setting."). Because Belcher was employed by IC the entire time he dreamed up, learned

how to create, and actually coded the PMA, I have no qualms about finding the second

factor in the test has been satisfied as well.

Last, the final consideration in the work-for-hire test is whether the work was

actuated, at least in part, by a purpose to serve the employer.  Belcher argues in his brief

that he created the PMA for his personal use [DE 212 at 13], but this bald assertion is

easily disproved by the undisputed evidence.  For starters, Belcher himself testified he

created the PMA to "help myself do my job better and perform higher for the company"

and the PMA was "strictly designed to better audit their [CN's] capital programs for

KPMG." [1st TRO Hrg. Tr., DE 195-8 at 3-4.]  Belcher further admitted he "provided

[the software] to everybody to use because it made their jobs and lives easier." [*Id.* at 6.]

Moreover, this computer program was created specifically to work with IC's

proprietary internal systems, and it only functions by being connected to IC's data

systems.  Belcher testified that the back end of the software "pulls data from various CN

Systems." [*Id.* at 6.] And he concedes "[c]ertainly a lot of people used it to perform

better at their jobs at CN." [Belcher Dep., DE 227-1 at 65.]  As Belcher explained, "the

finance team, would have been using it as an auditing tool.  All of engineering would

have used it to review their budget like I'd mentioned earlier.  Risk management used it

to see what costs were collected . . . ." [*Id.* at 66-67.]

There is no doubt the PMA was actuated, at least in part, by a purpose to serve

IC.  Belcher claims the work just happened to "incidentally benefit[] CN" [DE 216 at 4],

but this isn't true in light of Belcher's own testimony.  And, even if Belcher had some

personal agenda or ulterior motive, "the Restatement does not require that the servant's

only motivation be to help his or her employer; the motivation need only be partial."

*Genzmer*, 219 F.Supp.2d at 1282; *see also City of Newark v. Beasley*, 883 F.Supp. 3, 9 (D.N.J.

1995) (employer only required to prove that employee was at least "appreciably"

motivated by a desire to further the goals of his employer).

      Finally, there are written instruments that reflect the fact the PMA was a work

for hire, and independently show that IC owned the PMA. Every time Belcher received

Performance Share Units (which was three times during his tenure), he received and

accepted an award letter confirming that all the confidential information relating to IC

is the exclusive property of IC. [DE 193 at 4.]  Additionally, Belcher was asked to review

and sign IC's Code of Conduct on a yearly basis.  The evidence shows he affirmed the

Code of Conduct every year since 2007, and Belcher specifically acknowledged doing so

from 2015 onward.  [DE 195-1 at 3; DE 195-15 at 3; DE 227-1 at 15.]  The Code of

Business Conduct provides, in pertinent part:

> CN owns the intellectual property that employees, contractors and
> agents create while working for CN or using CN resources,
> *regardless of whether such intellectual property has been created on CN's*
> *premises or outside of regular work hours* . . . You agree that all such
> intellectual property is owned by CN and agree to transfer or
> assign ownership to CN and waive any moral rights in favour of
> CN.

[DE 195-1 at 195-96 (emphasis added).]  This also establishes ownership.  *See, e.g.,*

*Amylin Pharm.*, 54 F.Supp. 3d at 1010 (finding contract encompassing "[a]ll materials"

and "[a]ll writings" transferred all intellectual property); *Preston v. Marathon Oil Co.*, 684

F.3d 1276, 1288 (Fed. Cir. 2012) ("Because the assignment clause in the April Employee Agreement states that the employee agrees to 'hereby assign' all 'Intellectual Property,' it is an express assignment of rights in future inventions, and automatically assigned rights to Marathon without the need for any additional act."); *Berry v. Ford Motor Co.*, No. 11-10569, 2015 WL 1646657, at *3-4 (E.D. Mich. Apr. 14, 2015) (term "every invention . . . belongs to [the company]" in company professional services contract automatically transferred ownership of intellectual property at issue.)

For all of these reasons, it is clear by the undisputed facts in this case that IC owns the PMA as a work made for hire under the Copyright Act because the PMA is a "work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101. Belcher created the PMA while he was working for IC, as a tool to make his job easier, and it was eventually utilized by hundreds (if not thousands) of IC employees over almost a decade. While he was a self-made man who took classes and taught himself coding, Belcher unequivocally created the PMA to make his job at IC easier. The PMA was built to help collect and review data for IC's financial and auditing process (tasks in Belcher's bailiwick), and then Belcher personally participated in helping teach other employees how to use the program and maintained and helped upkeep the program. Whether some portion of this work occurred at home or on Belcher's personal laptop is irrelevant. IC owns the PMA as a work for hire.

In sum, IC is entitled to summary judgment on Belcher's claims under the Copyright Act.

**B.  IC's Motion for Summary Judgment on its Claims**

As noted above, IC also seeks summary judgment on the following claims brought in its Complaint: breach of contract (Count I); breach of the duty of loyalty (Count II); civil conversion (Count III); Indiana Uniform Trade Secrets Act ("IUTSA") (Count IV);  Defend Trade Secrets Act ("DTSA") (Count V); and trespass to chattels (Count VI). [DE 1 at 9-14.]

**1.    Breach of Contract**

I'll start with IC's claim for breach of contract.  Under Indiana law, the elements of a breach of contract action are "the existence of a contract, the defendant's breach thereof, and damages."  *United States Valves, Inc. v. Dray*, 190 F.3d 811, 814 (7th Cir. 1999).  Here, there is evidence Belcher breached both the Code of Conduct and the PSU Agreement when he asserted ownership of the PMA, took the source code when he left and undermined IC's operating systems, disclosed the PMA source code to the Copyright Office, and destroyed IC's hard drive in his computer by smashing and burning it. [DE 194 at 28.]  He breached the confidentiality provisions in these agreements and it is undisputed that IC was damaged by these actions. [DE 195-13 at 5; DE 195-14 at 7.]

Summary judgment on liability is therefore warranted on this claim.  *See Fitzgerald v. Murray*, 1:21-cv-1822- TWP-TAB, 2022 WL 4260389, at *9 (S.D. Ind. Sept. 15, 2022) (granting summary judgment where designated evidence established the existence and breach of contract, and resulting damages); *Sinioguine*, 2012 WL 2317364,

27

at *8 ("Defendants are entitled to judgment on each of the claims in which proof of ownership of the copyrights in the Programs is dispositive.").

### 2.    Breach of the Common Law Duty of Loyalty

IC also claims that Belcher breached his common law duty of loyalty to IC (Count II). "An employee owes his employer a fiduciary duty of loyalty." *SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*, 952 N.E.2d 758, 768 (Ind. Ct. App. 2011) (citing *Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1070 (Ind. Ct. App. 2007)). In support of this argument, IC points to the evidence showing Belcher disabled the PMA when he left, sent the e-mail to his supervisor demanding money to restore it, and embedded kill switches into the PMA to prevent it from working upon his departure. [DE 194 at 29.] He also published the PMA Manual, which IC claims was confidential, on LinkedIn. [2nd Boudreau Dec., DE 195-14 at 7-8.] IC also alleges Belcher "breached his duty of loyalty to IC when he unlawfully committed conversion of IC's property and trespass to chattels." [Compl., DE 1 at 11.]

While the parties do not address this, case law suggests that a breach of fiduciary duty claim cannot center on an allegation that the employee misappropriated trade secrets or confidential information, because that claim would be preempted by the IUTSA. *See HDNet, LLC v. N. Am. Boxing Council*, 972 N.E.2d 920, 923 (Ind. Ct. App. 2012); Ind. Code § 24-2-3-(1)(c) (providing the IUTSA "displaces all conflicting law of this state pertaining to the misappropriation of trade secrets, except contract law and criminal law."); *Hartford Steam Boiler Inspection & Ins. Co. v. Campbell*, No. 4:20-cv-00117-

*SEB-DML*, 2021 WL 1225951, at *10 (S.D. Ind. Mar. 31, 2021) ("To the extent that

[plaintiff] is alleging that the Individual Defendants breached their fiduciary duties of

loyalty by misappropriating trade secrets, that claim is obviously preempted by the

IUTSA."). Assuming that this preemption issue applies here, IC would have to state a

"plausible non-preempted theory of a fiduciary duty breach." *Chroma Cars, LLC v.*

*Harris*, No. 3:21-CV-825 DRL-MGG, 2022 WL 1686530, at *5 (N.D. Ind. May 25, 2022).

     This is a close call whether IC has alleged enough facts outside of the

misappropriation of trade secrets to support an independent claim of breach of

fiduciary duty. At this stage, because the parties have not addressed the preemption

issue whatsoever in their briefing, I'm not comfortable finding the misappropriation of

trade secrets and other information is not the gravamen of IC's breach of the duty of

loyalty claim. For this reason, summary judgment is not warranted on this claim.

     **3.**     **Civil Conversion and Trespass to Chattel Claims**

     IC also has claims for civil conversion in violation of Indiana Code §§ 34-24-3-1,

35-43-4-3 (Count III) and trespass to chattels (Count VI). For starters, it's clear these

claims apply to non-tangible property like software codes and websites. *See Wilkes v.*

*CareSource Mgmt. Grp. Co.*, No. 4:16-cv-038 JD, 2016 WL 7179298, at *5 (N.D. Ind. Dec. 9,

2016). In Indiana, "claims for conversion and trespass to chattel may be analyzed

together." *Coleman v. Vukovich*, 825 N.E.2d 397, 407 (Ind. Ct. App. 2005).

     However, these claims likely suffer the same fate as the breach of loyalty claim.

While Illinois law is more settled on this issue of preemption of civil conversion and

trespass to chattel claims than Indiana law, the IUTSA "abolishes claims other than those based on contract arising from misappropriate trade secrets, replacing them with claims under the Act itself." *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005) (finding same with the equivalent Illinois Trade Secrets Act); *Nat'l Auto Parts, Inc. v. Automart Nationwide, Inc.*, No. 14 C 8160, 2015 WL 5693594, at *4 (N.D. Ill. Sept. 24, 2015) ("Where a claim is predicated on the misuse of confidential or secret information, that claim is preempted by the [trade secrets act].").  Thus, it is likely that IC's conversion and trespass to chattels claims are also preempted by the IUTSA.  *See Inmar, Inc. v. Vargas*, No. 18-cv-2306, 2018 WL 6716701, at * 11 (N.D. Ill. Dec. 21, 2018) (and cases cited therein regarding preemption of trespass to chattels claims); *Wagner-Meinert Eng'g, LLC v. TJW Indus., Inc.*, 587 F.Supp.3d 744, 751-2 (N.D. Ind. 2022) (finding IUTSA preempted conversion claim where the only thing alleged converted was its "goodwill and intellectual property, including processes, data, and data tables within its [] software.").

There is another reason I am unwilling to grant summary judgment on these claims.  Because a claim of civil conversion has its roots in criminal law, there is a mens rea component to civil conversion.  Under the statute cited by IC in its complaint, Indiana Code § 35-43-4-3, a plaintiff must prove that the unauthorized control was done "knowingly or intentionally." *See* Ind. Code § 35-43-4-3;  *Manzon v. Stant Corp.*, 138 F.Supp.2d 1110, 1116 (S.D. Ind. 2001).  In other words, in a case like this one, IC must prove a criminal act was committed by Belcher.  *Squires v. Utility/Trailers of Indianapolis*, 686 N.E.2d 416, 420 (Ind. Ct. App. 1997).  In *Manzon*, for example, the court found that

an employee who retained his company car after being terminated did not have the

requisite criminal intent for criminal conversion.  The court found the employee

believed that the use of the car was pursuant to a contract. 138 F.Supp.2d at  1116-17.

I believe a question of fact remains in this case whether Belcher honestly believed

(even if he was mistaken) that the PMA belonged to him.  Therefore, claims of trespass

to chattel and conversion will need to be resolved by a jury.

### 4.    IUTSA and DTSA Claims

IC has also stated two trade secret misappropriation claims - Count IV for

violation of the Indiana Uniform Trade Secrets Act ("IUTSA"), Ind. Code § 24-2-3-1 *et

seq*.; and Count V for violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. *et

seq*..  "The elements of a claim under the DTSA and IUTSA are similar; key to each is the

existence of a trade secret and its misappropriation."  *Hartford Steam Boiler Inspection and

Insurance Co. v. Campbell*, No. 4:20-cv-117-SEB-DML, 2021 WL 1225951, at *5 (S.D. Ind.

Mar. 31, 2021).

Both the DTSA and the IUTSA contain complicated definitions of

misappropriation that include numerous subparts and multiple potential ways for a

claimant to show the trade secret was misappropriated.  For example, the DTSA defines

"misappropriation" in pertinent part as either the "acquisition of a trade secret of

another by a person who knows or has reason to know that the trade secret was

acquired by improper means" or the "disclosure or use of a trade secret of another

without express or implied consent by a person who - . . . . (ii) at the time of disclosure

31

or use, knew or had reason to know that the knowledge of the trade secret was - . . . (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(A)-(B). These seem to be the relevant portions of this statute, but I'm guessing at this as there are other subparts as well that I have not recited, *see* 18 U.S.C. § 1839(5)(A), (B)(I), (ii)(I-III), (iii)(I-II), and IC has not indicated what theory of misappropriation it is pursuing.

Similarly, the IUTSA defines "misappropriation" as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent by a person who: (A) used improper means to acquire knowledge of the trade secret; (B) at the time of disclosure or use, knew or had reason to know the trade secret was . . . (ii) acquired under the circumstances giving rise to a duty to maintain secrecy or limit its use; or (iii) derived from . . . a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.'" Ind. Code § 24-2-3-2. This statute also includes additional subparts under the definition of misappropriation. *See* Ind. Code § 24-2-3-2 (1), (2)(A), (2)(B)(i-iii), (2)(C).

IC has provided threadbare briefing on the issue of misappropriation of trade secrets. It basically claims IC owns the PMA and the PMA Manual, and Belcher misappropriated them when he blocked IC's access to the PMA, disclosed the PMA source code on the website of the Copyright Office, and published the PMA Manual on LinkedIn. [DE 194 at 30.] However, neither the briefing nor the complaint elucidates

32

what exact definition of misappropriation IC is relying upon.  Plus the theory of how

Belcher allegedly improperly disclosed the trade secret is also unclear.  It is also

confusing as to what "trade secret" in particular IC is claiming was misappropriated -

just the sourcecode? The PMA? The PMA manual?  And I'm puzzled about how these

alleged trade secrets were actually shared - what does disclosing the PMA source code

on the website of the Copyright Office actually entail?  Has the underlying code itself

been disclosed publically, or just a description of the code?  These claims lack clarity

and I have way too many unanswered questions to grant summary judgment on them.

Also what will be left for trial is, if the jury finds Belcher did misappropriate IC's

trade secrets, whether punitive damages are available.  The DTSA limits punitive

damages to wilful and malicious violations.  18 U.S.C. § 1836(b)(3)(c).  This mens rea

requirement will need to be determined by the fact finder, and based upon the facts

before me, it is unclear whether Belcher willfully and maliciously misappropriated IC's

trade secrets.

* * *

Let's sum up.  I've decided today, IC owns the PMA.  Belcher improperly took

the PMA source code and other materials and refused to return his copies of them, even

after being ordered by the Court. [Sept. 15, 2023 Order Granting Contempt Sanctions,

DE 125 at 4-6.]  He took IC's source code, interfered with IC's ability to conduct its

business, used a kill switch to disable the program, and then divulged the source code.

IC is therefore entitled to judgment as a matter of law on Belcher's counterclaims and its

33

breach of contract claim. However, because the parties did not address whatsoever the preemption issues, the breach of the duty of loyalty claim, civil conversion claim, and tresspass to chattels all survive. Additionally, a question of fact remains over whether Belcher harbored the requisite criminal intent for him to be liable for conversion or trespass to chattels. Finally, because of the lack of clarity on the trade secret misappropriation claims, summary judgment is not appropriate for them either, and a question of fact remains whether Belcher willfully and maliciously misappropriated IC's trade secrets and accordingly whether punitive damages are appropriate.

## Conclusion

For the foregoing reasons, Plaintiff's Motion for Sanctions [DE 208] is DENIED AS MOOT.

Defendant Michael Belcher's Motion for Partial Summary Judgment [DE 202] is DENIED.

Plaintiff Illinois Central Railroad Company's Motion for Summary Judgment [DE 192] is GRANTED IN PART and DENIED IN PART. It is GRANTED on IC's claims for breach of contract (Count I) in favor of IC and against Defendant Belcher; and GRANTED on Defendant Belcher's counterclaims which are DISMISSED WITH PREJUDICE.

IC's Motion for Summary Judgment [DE 192] is DENIED on the following claims which will proceed to trial: IC's claims for breach of the duty of loyalty (Count II), civil conversion (Count III), theft of trade secrets under both Indiana law and federal law

34

(Counts IV and V), trespass to chattels (Count VI), as well as on damages on the claim for which I have granted summary judgment.

SO ORDERED.

ENTERED: February 11, 2026.

/s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT